## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| LOMA LINDA UNIVERSITY,<br><br>Plaintiff,<br><br>v.<br><br>SMARTER ALLOYS, INC.,<br><br>Defendant | CIVIL ACTION NO.: _____<br><br><br>**COMPLAINT AND DEMAND FOR JURY TRIAL** |

Plaintiff, Loma Linda University ("LLU"), brings this action against Defendant, Smarter Alloys, Inc. ("SA"), and alleges as follows:

### NATURE OF THE SUIT

1.      This is a suit for breach of contract, quiet title to inventions, and in the alternative rescission of invention assignments.  As set forth below, SA has breached explicit or implied terms of a Consulting Agreement between the parties.  Moreover, invention assignments executed by LLU fail for lack of consideration, so that title to the assigned inventions should be quieted in LLU.  In the alternative, the invention assignments are rescinded due to mutual mistake.

### PARTIES

2.      LLU is a domestic non-profit university organized as a corporation under the laws of the State of California and with its principal place of business in California.  LLU's corporate offices are located at 11145 Anderson Street, Loma Linda University, Loma Linda, California 92354.

3.     On information and belief, SA is a for-profit Canadian corporation with its principal place of business located in Ontario, Canada, and offices at 75 Bathurst Drive, Waterloo, Ontario N2V 1N2.

## JURISDICTION AND VENUE

4.     This Court has jurisdiction of this case pursuant to 28 U.S.C. § 1332 because there is a diversity of citizenship between the parties and the amount in controversy exceeds the sum of $75,000.

5.     Venue is proper under 28 U.S.C. § 1391(c)(3) because SA is a foreign corporation.  Further, this litigation arises from a contract between LLU and SA that provides that the exclusive jurisdiction for any legal proceeding regarding that contract shall be in the U.S. District Court of the Western District of New York, such that both parties have expressly agreed that jurisdiction and venue are proper in this Court.

## FACTS

**A.     Subjective and Inconsistent Orthodontic Technology in the Early 2000s**

6.     Orthodontists use braces to address various dental conditions in patients, including malocclusions like impacted or high canines, rotated premolars, and tilted lateral incisors.

7.     Traditional orthodontic braces use brackets attached to teeth, with wires known as "archwires" used to connect the brackets.  Archwires are stiff so that when the brackets are attached to the archwires, the stiffness in the archwires applies force to the brackets that is then transferred to the teeth to which they are attached.  The teeth then exert pressure on the periodontal ligament (PDL), the connective tissue that anchors the teeth to the jaw and skull, eventually resulting in movement of the teeth.

2

8.     The movement of each tooth caused by the braces ultimately depends upon the force imparted by the tooth on the PDL.  For effective orthodontic treatment, the amount of force applied to the PDL must be sufficient to move the tooth but not so great as to damage the PDL or surrounding tissue.

9.     Different teeth have different amounts of PDL support, such that different forces must be applied to different teeth in order to achieve equalization of stresses in the relevant PDL area.  Using traditional archwires, however, orthodontists installing braces could not account for the variable forces needed for each individual tooth.

10.     Orthodontists were instead forced to rely on braces that used archwires with uniform stiffness or three zones of differing stiffness.  The three-zone wires were fabricated by applying thermal heating methods to change the properties of the wires to create three zones of discrete stiffness.

11.     In either case, the archwires could not provide the variable forces needed to achieve equalization of stresses in the relevant PDL area for each tooth, taking into account each tooth's unique root structure.   Three-zone archwires provided some variation in forces on different teeth, for example by providing the greater forces required to move bigger teeth, such as molars.  However, the use of three-zone archwires relied only on individual practitioners' subjective judgment of relative PDL support for each tooth, and lacked any specific calculation of the individual force conditions of each tooth.

**B.     Dr. Viecilli's Groundbreaking Research on Ideal Force**

12.     In 2013, Dr. Rodrigo Viecilli, DDS, PhD, an acclaimed professor and research scientist in dentistry and orthodontia, and a preeminent practitioner of applying finite element analysis (FEA) to orthodontics, sought to calculate the ideal force to be exerted on each tooth

with respect to the PDL in a human mouth.   Prior to Dr. Viecilli's research, completed in collaboration with Dr. Charles Burstone, a preeminent orthodontist and professor, ideal forces were known only for select teeth, but comprehensive calculations for all teeth had not yet been performed.

13.     In preparation for conducting the FEA, Dr. Viecilli scanned a human skull using x-rays to produce a three-dimensional model of a skull where the dimensions of the teeth approximately matched average anatomical values.  Dr. Viecilli then digitally added the PDL to this skull scan and divided the bone, teeth, and PDL into hundreds of thousands of small, three-dimensional polygons.  Using FEA, Dr. Viecilli then calculated "load proportion numbers" for 14 different tooth structures (ranging from central incisor to first molar) for four different types of forces.

14.     Dr. Viecilli published his findings in 2015 in the *Journal of Orthodontics and Craniofacial Research*, including the "load proportion numbers," in an article co-authored by Dr. Burstone.   The article was accepted for publication on November 11, 2014.   The authors concluded that "no currently available orthodontic appliance, as a simple combination of archwire and bracket, can achieve the ideal load proportions between teeth during alignment," and further noted that the forces imparted by braces on teeth will depend upon, *inter alia*, "the interbracket distances and material properties of the archwire."

15.     At the time that Drs. Viecilli and Burstone performed their analysis, however, no one had developed a methodology that could be used to conduct a quantitative analysis of "interbracket distances" or identify specific "properties of archwire[s]" that would provide "ideal load proportions" in this context.   Moreover, Drs. Viecilli and Burstone did not publish or otherwise disclose the mathematical FEA model used to calculate the ideal load proportion

4

numbers.  To take advantage of what they had discovered regarding ideal load proportions, Drs.

Viecilli and Burstone began development of an orthodontic archwire having different archwire

segments with varying stiffness that could deliver idealized force loads to individual teeth.

     **C.**     **Smarter Alloys' Engagement with Dr. Viecilli and LLU to Develop a New Archwire**

     16.     In September 2013, Dr. Viecilli joined LLU as a faculty professor and researcher.

Dr. Viecilli continued the work he had begun with Dr. Burstone.

     17.     On March 12, 2015, Dr. Viecilli, LLU, and SA signed a Memorandum of

Understanding (the "Memorandum"), having an effective date of March 3, 2015, detailing a

Statement of Work through which SA would fund research and development activities for

orthodontic multi-force archwires targeting specific classes of commonly observed

malocclusions.  The work was to be performed by Dr. Viecilli in his capacity as a faculty

member employee of LLU.  The terms of the Memorandum were explicitly "non-binding."  A

copy of the Memorandum is attached hereto as Exhibit 1 and is incorporated herein by reference.

     18.     On June 5, 2015, Dr. Viecilli and LLU entered into a Consulting Agreement with

SA (the "Consulting Agreement"), under which Dr. Viecilli and LLU agreed to conduct research

and consult with SA in exchange for financial compensation and future royalties.  A copy of the

Consulting Agreement is attached hereto as Exhibit 2 and is incorporated herein by reference.

     19.     The Consulting Agreement indicates a retroactive Effective Date of December 10,

2014, and a Termination Date of December 31, 2015.

     20.     Section IV.A. of the Consulting Agreement provides that intellectual property

"created, authored, or conceived between the Effective Date and the termination date of [the]

Agreement shall be the sole property of [SA]."  The Consulting Agreement further adds that

"[t]he parties grant no right, title, interest, or license to the other party in [intellectual property] existing prior to Effective Date of this Agreement."

21.     Section VIII.D. of the Consulting Agreement includes a Forum Selection Clause stating that the "exclusive jurisdiction for any legal proceeding regarding this Agreement shall be in the U.S. District Court of the Western District of New York."  The Consulting Agreement also states that in any lawsuit "to enforce or interpret the terms of this Agreement, the prevailing party shall be entitled, in addition to its court costs, to such reasonable attorneys' fees, expert witness fees and legal expenses as shall be fixed by a court of competent jurisdiction."

22.     As set forth in "Exhibit A: Description of Consulting Services" of the Consulting Agreement, SA agreed to fund research and development activities to be performed by Dr. Viecilli (referred to in the Consulting Agreement as the "Principal Investigator") "directed to multi-force archwire prescriptions targeting specific classes of commonly observed malocclusions."

23.     The "Research Plan" in Exhibit A of the Consulting Agreement provides that Dr. Viecilli would use FEA to "explore changes in stiffness of NiTi [arch]wires for various malocclusion situations and resulting effects on forces."  Section 5 of the Research Plan further indicates that Dr. Viecilli would use FEA to research the impact of "[d]ifferent interbracket distances" on three different malocclusions: impacted or high canines, rotated premolars, and tilted lateral incisors.

24.     Pursuant to "Exhibit B: Compensation and Reimbursement" of the Consulting Agreement, SA agreed to pay a royalty earned on the sale of any "Products," or alternatively pay an upfront milestone payment to eliminate the royalty provision (the "Buyout") if SA commercialized a "Product."  A "Product" is defined by the Consulting Agreement as "an

6

archwire that uses the force prescriptions targeting the three malocclusions set out in Section 5 of Exhibit A, Research Plan."

**D.**   **Dr. Viecilli and LLU's Intellectual Property**

25.     Section IV.A. of the Consulting Agreement distinguishes between intellectual property created, authored, or conceived between the Effective Date and the Termination Date of the Consulting Agreement, which is defined to be the sole property of SA; and intellectual property existing prior to the Effective Date of the Consulting Agreement, for which both parties agree there will be no grant of right, title, interest, or license to the other party.

26.     On April 6, 2015, LLU filed U.S. Provisional Patent Application Number 62/143,727 (the "'727 provisional application"), directed to "Systems and Methods for Designing Orthodontic Archwires for Malocclusions," and listing Dr. Viecilli and Dr. Burstone as co-inventors.  The '727 provisional application was based on the research by Dr. Viecilli and Dr. Burstone in 2013 that is described in paragraphs 13 to 15.  The '727 provisional application has since expired.

27.     The invention disclosed in the '727 provisional application was conceived prior to the December 10, 2014, Effective Date of the Consulting Agreement.

28.     On April 6, 2015, Dr. Viecilli signed and filed with the United States Patent and Trademark Office ("USPTO") an assignment of all rights in the '727 provisional application to LLU (the "'727 LLU Assignment").

29.     On May 18, 2015, LLU filed U.S. Provisional Patent Application Number 62/163,338 (the "'338 provisional application"), directed to "Systems and Methods for Designing Orthodontic Archwires for Malocclusions," and listing Dr. Viecilli and Dr. Burstone as co-inventors.  The '338 provisional application was based on the research by Dr. Viecilli and

7

Dr. Burstone in 2013 that is described in paragraphs 13 to 15. The '338 provisional application has since expired.

30.    The invention disclosed in the '338 provisional application was conceived prior to the December 10, 2014, Effective Date of the Consulting Agreement.

31.    On May 22, 2015, Dr. Viecilli signed and filed with the USPTO an Assignment of all rights in the '338 provisional application to LLU (the "'338 LLU Assignment").

32.    In August 2015, Dr. Viecilli and LLU assigned the '727 provisional application to SA (the "'727 SA Assignment"). The '727 SA Assignment indicated an effective date of April 6, 2015, and was signed by Dr. Viecilli, LLU, and Ibraheem Khan, CEO of Smarter Alloys, Inc.

33.    Section 261 of the Patent Act provides that an assignment must be recorded to perfect title in an invention against any subsequent bona fide purchaser for value without notice. Nevertheless, SA failed to record the '727 SA Assignment with the USPTO.

34.    In March 2016, Dr. Viecilli and LLU assigned the '338 provisional application to SA (the "'338 SA Assignment"). The '338 SA Assignment listed an effective date of May 18, 2015, and was signed by Dr. Viecilli and LLU. The '338 SA Assignment was not signed by SA, and SA failed to record the '338 Assignment with the USPTO.

35.    On April 5, 2016, unbeknownst to Dr. Viecilli and LLU, SA filed U.S. Non-Provisional Patent Application Number 15/091,204 (the "'204 non-provisional application"), titled "Systems and Methods for Designing Orthodontic Archwires for Malocclusions." In filing the '204 non-provisional application, SA wrongly listed Dr. Viecilli and Dr. Khan as co-inventors, and listed SA itself as the applicant. SA did not list Dr. Burstone as an inventor. SA did not seek an inventor's declaration from Dr. Viecilli. The '204 non-provisional application

did claim priority to both the '727 provisional application and the '338 provisional application, and is currently pending.

36.     The '204 non-provisional application was filed without Dr. Viecilli or LLU's permission or knowledge.  Dr. Khan is not a proper inventor of the subject matter of the '204 non-provisional application.

37.     On April 25, 2016, SA filed U.S. Provisional Patent Application Number 62/327,044 (the "'044 provisional application"), titled "Introduction to the Technological and Clinical Benefits of SmartArch," listing only Dr. Khan as the inventor.  The '044 provisional application has since expired.

38.     The specification of the '044 provisional application is a White Paper of the same title, and includes data, text, and graphics created, authored, and originated by Dr. Viecilli. Nonetheless, SA failed to list Dr. Viecilli as an inventor on the application.

39.     Indeed, the '044 provisional application directly references and gives credit to Drs. Viecilli and Burstone as the originators of the research and data behind SmartArch, stating "[t]he optimized biomechanics for tooth movement and retention were determined by modelling the dentoalveolar complex.  Drs. Charles Burstone and Rodrigo Viecilli implemented the finite element method to simulate the detention of a typical typodont.  The results were used to develop archwire stiffness profiles that, when interbracket spacing is considered, are able to deliver ideal individual targeted forces (Figure 3)."

40.     The '044 provisional application was filed without Dr. Viecilli or LLU's permission or knowledge.  Dr. Khan is not a proper inventor of the subject matter of the '044 provisional application.

9

41.     On April 25, 2017, also unbeknownst to Dr. Viecilli and LLU, SA filed U.S. Non-Provisional Patent Application Number 15/496,085 (the "'085 non-provisional application"), directed to "Systems and Methods for Designing Orthodontic Archwires for Malocclusions."  In filing the '085 non-provisional application, SA wrongfully listed Dr. Viecilli and Dr. Khan as co-inventors and listed SA itself as the applicant.  SA did not list Dr. Burstone as an inventor.  SA did not seek an inventor's declaration from Dr. Viecilli.  The '085 non-provisional application purports to be a continuation-in-part of the '204 non-provisional application and also claims priority to each of the '727 provisional application, the '338 provisional application, and the '044 provisional application, and is currently pending examination.

42.     The '085 non-provisional application was filed without Dr. Viecilli or LLU's permission or knowledge.  Dr. Khan is not a proper inventor of the subject matter of the '085 non-provisional application.

**E.      Sale of the SmartArch Product and SA's Wrongful Non-Payment to LLU**

43.     On April 26, 2016, SA published a press release on its website, www.smarteralloys.com, announcing the commercial launch of SmartArch, a "revolutionary archwire technology [that] reduces orthodontic treatment time," and stating that, "[e]ffective immediately, SmartArch is available for purchase in the United States through the official online store http://www.smartarchortho.com."   To LLU's knowledge, SmartArch is and has been available for sale throughout the United States since at least April 2016, including in the state of New York.

44.     SA's press release further touted Dr. Viecilli's contribution in the development of SmartArch, stating that, "[t]hrough collaborative research with biomechanics experts Dr. Charles Burstone and Dr. Rodrigo Viecilli, the SmartArch Universal stiffness profile was optimized

10

considering each tooth's spacing and root support." A copy of the press release including this statement is attached hereto as Exhibit 3 and is incorporated herein by reference.

45.    SA also advertised and marketed Dr. Viecilli's contribution to the SmartArch product throughout its website. Attached hereto as Exhibit 4 are screenshots of SA's website from July 2015 to March 2019 that sought to capitalize on Dr. Viecilli's involvement in the SmartArch project.

46.    At least as of May 2, 2016, SA also made publicly available on its website a "White Paper," attached as Exhibit 5, explaining the technology used in the SmartArch product and again highlighting the central role that Dr. Viecilli played in the development of the product. This White Paper is identical to the specification filed with the '044 provisional application.

47.    At least as of early 2019, SA began selling the SmartArch with third party Ormco Corporation ("Ormco"), a leading orthodontic supplies company. Exhibit 6 is a copy of Ormco's website offering the SmartArch for sale. The Ormco website asserts that SmartArch "deliver[s] forces closely matching Drs. Viecilli and Burstone's established ideals."

48.    Since at least February 2019, Ormco has aggressively marketed the SmartArch, headlining product details on the company's website homepage.

49.    SA has also sold the SmartArch through third party Patterson Dental, a company owned by Patterson Companies, Inc. Patterson Dental was responsible for more than $2 billion in sales in the dental, animal health, and medical markets in 2018. Exhibit 7 is a copy of the website for Patterson Dental offering the SmartArch for sale.

50.    Dr. Viecilli and LLU became aware of SA's sale of the SmartArch through Ormco indirectly, when Dr. Viecilli learned of a conference in January 2019 at which Dr. Eugene Roberts, a consultant for Ormco, gave a presentation on the SmartArch product and

11

associated technology.   During his presentation, Dr. Roberts gave credit to Dr. Viecilli as the originator of the technology behind the SmartArch.   Nonetheless, SA did not notify LLU of either the presentation or the arrangement with Ormco to aggressively market the SmartArch product.

51.     To date, SA has wrongfully and knowingly failed to compensate LLU pursuant to the terms of the Consulting Agreement, while simultaneously relying on Dr. Viecilli's name and reputation in the orthodontic community to promote sales of the SmartArch product.

52.     On March 6, 2019, LLU provided SA with written notice of SA's breach of the Consulting Agreement.   SA has asserted that it does not owe LLU any royalties.

## NATURE OF THE CLAIMS

### FIRST CAUSE OF ACTION
### (Breach of Contract)

53.     LLU repeats and realleges the allegations of paragraphs 1 through 52 as though fully set forth herein.

54.     The Consulting Agreement is a valid contract between LLU and SA.

55.     LLU and Dr. Viecilli properly performed their duties under the Consulting Agreement.

56.     SA's SmartArch product is a covered "Product" as defined in the Consulting Agreement.

57.     Under the Consulting Agreement, SA is obligated to pay LLU either royalty fees or a one-time Buyout upon commercialization of a Product as defined in the Consulting Agreement.

12

58.     SA failed to perform its duty of paying to LLU either royalties or the Buyout upon commercialization of the SmartArch product, and LLU has suffered and will continue to suffer damages as a result of that failure to pay.

59.     Pursuant to Section VIII.D. of the Consulting Agreement, in addition to damages, LLU is entitled to recover from SA reimbursement for reasonable attorneys' fees, expert witness fees, legal expenses, and costs incurred to enforce or interpret the Consulting Agreement.

60.     As a result of SA's failure to perform its obligations owing under the Consulting Agreement, SA has materially breached the Consulting Agreement.

### SECOND CAUSE OF ACTION
### (Breach of Covenant of Good Faith and Fair Dealing)

61.     LLU repeats and realleges the allegations of paragraphs 1 through 60 as though fully set forth herein.

62.     Exhibit B to the Consulting Agreement provides that SA must pay a royalty fee on the gross profits earned on the sale of any Products.

63.     Sales of SmartArch by third parties are "the sale of … Products" pursuant to the Consulting Agreement.

64.     However, in the alternative, if the sales of SmartArch by third parties are not "the sale of … Products" explicitly described by the Consulting Agreement, then SA has breached the covenant of good faith and fair dealing.  A benefit of the bargain in the Consulting Agreement was that LLU would receive royalties from the commercialization of a product developed through the consultation services provided by LLU and Dr. Viecilli.

65.     SA would deprive LLU of the benefit of the bargain if SA could commercialize the SmartArch through an intermediary, whether by licensing, wholesale, or some other

13

mechanism, an act which SA could not do directly without paying the royalties described in the Consulting Agreement.

66.    SA has deprived and continues to deprive LLU of the benefit of the bargain by contributing to and supporting the sales of the SmartArch by Ormco without paying royalties to LLU.  SA has accordingly breached the covenant of good faith and fair dealing.

**THIRD CAUSE OF ACTION**
**(Quiet Title Based on Failure of Consideration)**

67.    LLU repeats and realleges the allegations of paragraphs 1 through 66 as though fully set forth herein.

68.    When rights to an invention set forth in a patent or patent application are conveyed via contract, that agreement must be supported by consideration on both sides.

69.    The '338 SA Assignment and the '727 SA Assignment purport to be supported by "good and valuable consideration," but identify only the Consulting Agreement as consideration.

70.    However, the Consulting Agreement did not require the assignment of the inventions described in the '727 provisional application and the '338 provisional application because those inventions were conceived before the Effective Date of the Consulting Agreement.

71.    Indeed, the article that laid the foundation for these inventions was accepted for publication in November 2014, before the Effective Date of the Consulting Agreement.

72.    As a result, the '338 SA Assignment and the '727 SA Assignment fail for lack of consideration, and the inventions described in the '727 provisional application and the '338 provisional application remain the property of LLU, as well as any rights flowing from those inventions.

14

73.     SA has filed the '204 non-provisional application and the '085 non-provisional application, both of which claim priority to the '727 provisional application and the '338 provisional application and list Dr. Viecilli as an inventor.

74.     However, these non-provisional applications identify SA itself as the applicant. Pursuant to 35 U.S.C. § 118, SA can only prosecute these patent applications as an applicant if the inventor has "assigned or is under an obligation to assign the invention" or if SA "otherwise shows sufficient proprietary interest."

75.     Because the '338 SA Assignment and the '727 SA Assignment fail for lack of consideration, SA cannot demonstrate a sufficient proprietary interest in the pending applications.

76.     SA has filed the '044 provisional application, the specification of which was entirely based on information developed by Drs. Viecilli and/or Burstone.

77.     Thus, LLU requests a declaration that it has clear title to its previous interests in the inventions described in the '727 provisional application and the '338 provisional application, including the related rights to (1) the '727 provisional application, (2) the '338 provisional application, (3), the '044 provisional application, (4) the '204 non-provisional application, and (5) the '085 non-provisional application, and that LLU receives all rights flowing therefrom.

78.     LLU's remedies at law are inadequate to compensate LLU for the loss of its intellectual property.  For example, LLU has lost the opportunity to license these inventions and applications to third-party orthodontics manufacturers.

79.     LLU seeks further injunctive relief quieting title in LLU of its previous interests in the inventions described in the '727 provisional application and the '338 provisional application, including the related rights to the three provisional and two non-provisional

applications, as well as a directive that SA cooperate in removing itself as the applicant for the '204 non-provisional application and the '085 non-provisional application. In the alternative, LLU requests the formation of a constructive trust to transfer ownership back to LLU of its previous interests in the inventions described in the '727 provisional application and the '338 provisional application, including the related rights to the three provisional and two non-provisional applications.

**FOURTH CAUSE OF ACTION**
**(Rescission Based on Mutual Mistake)**

80.     LLU repeats and realleges the allegations of paragraphs 1 through 79 as though fully set forth herein.

81.     The only consideration identified in the '338 SA Assignment and the '727 SA Assignment is the Consulting Agreement.

82.     However, the Consulting Agreement did not require the assignment of the inventions described in those provisional applications because those inventions were conceived before the Effective Date of the Consulting Agreement.

83.     LLU and SA were both mistaken that the Consulting Agreement required that LLU assign to SA the inventions in the '338 provisional application and the '727 provisional application.

84.     As described above, the '338 SA Assignment and the '727 SA Assignment failed for lack of consideration. In the alternative, due to the mutual mistake regarding LLU's obligation to provide these assignments, LLU requests that the assignments be rescinded.

85.     With those assignments rescinded, LLU should be declared to own its previous interests in the inventions described in the provisional applications, including the related rights to (1) the '727 provisional application, (2) the '338 provisional application, (3), the '044

16

provisional application, (4) the '204 non-provisional application, and (5) the '085 non-provisional application, and to receive all rights flowing therefrom.

86.    LLU's remedies at law are inadequate to compensate LLU for the loss of its intellectual property.  For example, LLU has lost the opportunity to license these inventions and applications to third-party orthodontics manufacturers.

87.    LLU therefore seeks further injunctive relief, including a directive that SA cooperate in removing itself as the applicant for the '204 non-provisional application and the '085 non-provisional application.   In the alternative, LLU requests the formation of a constructive trust to transfer ownership back to LLU of its previous interests in the inventions described in the '727 provisional application and the '338 provisional application, including the related rights to the three provisional and two non-provisional applications.

## **PRAYER FOR RELIEF**

WHEREFORE, LLU prays for judgment against SA as follows:

a.     For actual, consequential, and incidental damages, all in an amount to be determined by the finder of fact;

b.     For an award against SA for reasonable attorneys' fees, expert witness expenses, and costs incurred herein, and any additional fees and costs as deemed appropriate by the Court;

c.     For pre-judgment interest on those monies owed by SA to LLU;

d.     For a declaration that the '727 SA Assignment and the '338 SA Assignment fail for lack of consideration;

e.     For rescission of the '727 SA Assignment and the '338 SA Assignment;

17

f.     For a declaration that LLU and not SA owns LLU's previous interests in the inventions described in the '727 SA Assignment and the '338 SA Assignment, including the related rights to (1) the '727 provisional application, (2) the '338 provisional application, (3), the '044 provisional application, (4) the '204 non-provisional application, and (5) the '085 non-provisional application;

g.     For an injunction prohibiting SA from recording the '727 SA Assignment or the '338 SA Assignment with the USPTO;

h.     For an injunction requiring SA to cooperate in removing itself as the applicant for the '204 non-provisional application and the '085 non-provisional application, for example, pursuant to 37 C.F.R. § 146(c) and 37 C.F.R. § 373;

i.     In the alternative to such injunctive relief, for establishment of a constructive trust to convey to LLU its previous interests in the inventions described in the '727 provisional application and the '338 provisional application, including the related rights to (1) the '727 provisional application, (2) the '338 provisional application, (3), the '044 provisional application, (4) the '204 non-provisional application, and (5) the '085 non-provisional application, and all rights flowing therefrom; and

j.     For such other and further relief as the Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, LLU hereby demands a trial by jury on all issues raised by this Complaint.

By: */s/ Barry Herman*

Barry Herman (applying *pro hac vice*)
William Hubbard (applying *pro hac vice*)
WOMBLE BOND DICKINSON (US) LLP
100 Light Street, 26th Floor
Baltimore, MD 21202
Telephone: (410) 545-5830
Barry.Herman@wbd-us.com
Will.Hubbard@wbd-us.com

Jeffrey Whittle (applying *pro hac vice*)
Joshua Davis (applying *pro hac vice*)
Kristin Lamb (applying *pro hac vice*)
WOMBLE BOND DICKINSON (US) LLP
811 Main Street, Suite 3130
Houston, TX, US 77002
Telephone: (346) 998-7801
Jeffrey.Whittle@wbd-us.com
Joshua.P.Davis@wbd-us.com
Kristin.Lamb@wbd-us.com

ATTORNEYS FOR PLAINTIFF
LOMA LINDA UNIVERSITY

Buffalo, New York
May 10, 2019