UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____


LOMA LINDA UNIVERSITY,

        Plaintiff,

    v.

SMARTER ALLOYS, INC.,

        Defendant/Third-Party
        Plaintiff,

    v.

RODRIGO VIECILLI,

        Third-Party Defendant.

19-CV-607-LJV-MJR
DECISION & ORDER

_____

This case gives new meaning to the adage "Put your money where your mouth is."

Last year, this Court presided over a trial that centered around a disagreement about a contract designed to facilitate the research and development of certain orthodontic devices.  The parties—plaintiff Loma Linda University ("Loma Linda") and third-party defendant and Loma Linda faculty member Dr. Rodrigo Viecilli on one side, and defendant and third-party plaintiff Smarter Alloys, Inc. ("Smarter Alloys"), on the other—vehemently disagreed about what that contract meant, so much so that they all spent countless hours and wildly disproportionate attorney's fees litigating a dispute that ended up being about royalties totaling no more than $60,000 and change.

So after roughly five years of pretrial discovery and motion practice, multiple lawyers on both sides spent six days fighting tooth and nail about whether Smarter

Alloys owed Loma Linda royalties based on the sale of an orthodontic device known as the SmartArch Universal.  When the dust settled, the jury decided that it did and returned a $1.5 million dollar verdict in Loma Linda's favor—one that far exceeded the damages proved at trial.

Smarter Alloys filed three post-trial motions challenging that result.  *See* Docket Item 296.  First, Smarter Alloys moved under Federal Rule of Civil Procedure 50(b) for this Court to enter judgment as a matter of law in its favor.  Docket Item 326 at 15-22.[1] Second, in the alternative, it asked this Court to remit the jury's $1.5 million award.  *Id.* at 22-28.  Finally, if the Court were to grant either of those motions, Smarter Alloys asked the Court to find that Loma Linda is not the prevailing party.  *Id.* at 28-29.

After Loma Linda opposed each of these motions, *see* Docket Item 311, Smarter Alloys replied, Docket Item 314.  For the reasons that follow, this Court denies Smarter Alloys' motion for judgment as a matter of law; grants its motion for remittitur; and denies without prejudice its motion for this Court to determine that Loma Linda is not the prevailing party.

---

[1] Page numbers in docket citations refer to ECF pagination.  The docket numbering may seem chronologically odd:  Smarter Alloys initially filed a redacted version of its memorandum of law in support of its post-trial motions, Docket Item 296-3, and only later—in response to this Court's order, *see* Docket Item 322—filed the unredacted version that the Court refers to throughout this order, Docket Item 326. Thus, the docket number for the memorandum in support of the post-trial motions is higher than the docket numbers for the response and reply to it.

**BACKGROUND**[2]

The parties' dispute centers on a contract signed more than a decade ago.  *See*

Docket Item 235 (joint statement of the case); Docket Item 248 (joint stipulated facts).

In late 2014, Smarter Alloys began talks with Dr. Viecilli about an agreement under

which Viecilli would provide research and consulting services to Smarter Alloys.[3]

Docket Item 248 at ¶ 1.  The talks progressed, and on June 5, 2015, Loma Linda and

Smarter Alloys "entered into a [c]onsulting [a]greement":  Viecilli, as a Loma Linda

faculty member, committed to "provid[ing] Smarter Alloys with consulting and research

services directed at variable force archwire prescriptions" in exchange for lump sum and

royalty payments.[4]  Docket Item 235 at 1; *see* Docket Item 323-6 (consulting

agreement).  The agreement had a "retroactive effective date of December 10, 2014[,]

and a . . . termination date of December 31, 2015."  Docket Item 248 at ¶ 6.

More specifically, the agreement provided that Smarter Alloys would pay $31,000

to Loma Linda and Viecilli "[i]n compensation for the [s]ervices to be performed."

Docket Item 323-6 at 9; Docket Item 248 at ¶ 10.  It further provided that should Smarter

Alloys "commercialize a Product" as defined by the agreement, the company "shall pay

---

[2] The Court assumes the reader's familiarity with the factual and procedural background and will recount the facts only as necessary to explain its decision.

[3] These negotiations also involved another researcher, Dr. Charles Burstone. *See* Docket Item 248 at ¶ 1.  But Burstone died in February 2015, only a few months after the talks commenced and before the contract was formalized.  *See id.* at ¶¶ 1, 3-4.

[4] At trial, the parties disputed whether Viecilli was a party to the consulting agreement.  *See* Docket Item 235.  But because the jury found that Smarter Alloys had not prevailed on its claim that Loma Linda and Dr. Viecilli had breached the contract—a determination that Smarter Alloys does not challenge, *see* Docket Item 326—that is no longer a live issue.

a royalty of 4% of gross profits earned on the sale of any Products." Docket Item 323-6 at 9. A "Product" was defined, in turn, as "an archwire that uses the force prescriptions targeting the three malocclusions set out in Section 5 of [the] Research Plan" included in the agreement.[5]  *Id.*  And Section 5 of the "Research Plan" identified the three malocclusions that a "Product" would target as: (1) "[a]n impacted or high canine," (2) "[r]otated premolars," or (3) "[t]ilted lateral incisors."  *Id.* at 7-8.

It is undisputed that Smarter Alloys paid $31,000 to Loma Linda and Viecilli "as set out in" the consulting agreement.  Docket Item 248 at ¶ 11.  But throughout this litigation, the parties have contested—and still contest—whether Smarter Alloys paid the royalties that it owed.  More specifically, the parties dispute whether Smarter Alloys ever "commercialize[d] a Product" within the meaning of the consulting agreement.  And that dispute involves the question of whether a product that Smarted Alloys marketed was a "Product" under the agreement.

In spring 2015—before the consulting agreement was signed but after its effective date—Smarter Alloys "made prototype archwires . . . called the 'SmartArch Focus.'"  *Id.* at ¶ 12.  It "never sold any of the SmartArch Focus archwires," however; in fact, "[b]ased on feedback at the American Association of Orthodontics meeting in May 2015, Smarter Alloys abandoned" that product.  *Id.* at ¶¶ 13-14.

Following the 2015 meeting, the definition of "Product" in the draft consulting agreement was changed from "an archwire that uses prescriptions targeting specific

---

[5] A "malocclusion" is the improper alignment of teeth, including, as relevant here, impacted or high canines, rotated premolars, or tilted lateral incisors.  *See* Docket Item 323-6 at 7; *see generally* Malocclusion of Teeth, Mount Sinai (last updated Mar. 31, 2024), https://www.mountsinai.org/health-library/diseases-conditions/malocclusion-of-teeth (last visited Sept. 3, 2025).

malocclusions" to the definition included in the final version and noted above.  *See id.* at ¶ 15.  And instead of focusing on the SmartArch Focus, Smarter Alloys "decided to concentrate its efforts on commercializing a universal profile archwire, . . . [the] 'SmartArch Universal,'" which was "brought to market by Smarter Alloys in 2016[] and later sold and marketed by Ormco [Corporation]," an orthodontics manufacturer.  *See id.* at ¶¶ 16, 18.

Smarter Alloys never paid any royalties to Loma Linda based on the sale of the SmartArch Universal.  So on May 10, 2019, Loma Linda filed suit in this Court against Smarter Alloys, asserting claims for breach of contract, for breach of the covenant of good faith and fair dealing, to quiet title based on failure of consideration, and for rescission based on mutual mistake.[6]  Docket Item 1; *see* Docket Item 113 (amended complaint).  Smarter Alloys then filed counterclaims against Loma Linda and third-party claims against Dr. Viecilli for breach of contract, breach of the covenant of good faith and fair dealing, and fraudulent concealment.  Docket Item 46.  This Court referred the case to United States Magistrate Judge Michael J. Roemer for all proceedings under 28 U.S.C. § 636(b)(1)(A) and (B).  Docket Item 45.

After this Court dismissed some of Smarter Alloys' counterclaims against Loma Linda and third-party claims against Dr. Viecilli, *see* Docket Item 67, and after both sides filed amended pleadings, *see* Docket Items 113 and 115, Smarter Alloys moved for summary judgment, *see* Docket Items 103 and 117.  Judge Roemer issued a Report and Recommendation ("R&R") finding that Smarter Alloys' motion for summary

---

[6] Loma Linda later amended its complaint to add a claim based on quasi-contract.  *See* Docket Item 113.

judgment should be granted in part and denied in part and that judgment be entered in Loma Linda's favor on the remaining claims.  Docket Item 170.  As relevant here, Judge Roemer recommended granting Smarter Alloys' motion for summary judgment on Loma Linda's breach of contract claim because he found that the definition of "Product" in the consulting agreement's royalty provision was "unambiguous as a matter of law."  *See id.* at 19.  Judge Roemer read that definition to mean an "archwire[] that target[s only] the identified malocclusion areas, rather than [an] archwire[] designed for all sections of the dental arch."  *See id.*  And because the SmartArch Universal can treat both the identified malocclusions as well as others, Judge Roemer found that it was not a "Product" under the agreement.  *See id.* at 22.

In ruling on objections to the R&R filed by both sides, *see* Docket Items 173 and 174, this Court respectfully disagreed with Judge Roemer regarding Loma Linda's breach of contract claim, Docket Item 193.  Instead, it held that "the plain language of the consulting agreement is ambiguous."  *See id.* at 12.  It further found that "the extrinsic evidence" offered by the parties "d[id] not clarify that ambiguity" and that whether the SmartArch Universal was a "Product" under the consulting agreement presented a genuine issue of material fact that had to be resolved at trial.  *See id.* at 14-17.

Ultimately, the Court adopted Judge Roemer's R&R in part, granting Smarter Alloys summary judgment on Loma Linda's claims for breach of the covenant of good faith and fair dealing, to quiet title, for rescission, and for quasi-contract relief and denying summary judgment as to Loma Linda's breach of contract claim and Smarter Alloys' breach of contract counterclaim against Loma Linda and third-party claim against

Viecilli. *See id.* at 24. Those breach of contract claims then proceeded to trial, where— as relevant here—both sides presented evidence about whether the SmartArch Universal was a "Product" under the consulting agreement and whether Smarter Alloys breached that agreement by failing to pay royalties based on the sale of the SmartArch Universal.[7] As noted above, the jury agreed with Loma Linda, determining that Smarter Alloys had breached the consulting agreement and that it owed Loma Linda $1.5 million dollars in damages for that breach. *See* Docket Item 287. Smarter Alloys now challenges that verdict. *See* Docket Item 326.

## LEGAL PRINCIPLES

A court may grant a motion for judgment as a matter of law "only if after viewing the evidence in the light most favorable to the non-moving party and drawing all reasonable inferences in favor of the non-moving party, it finds that there is insufficient evidence to support the verdict*." Fabri v. United Techs. Int'l, Inc.*, 387 F.3d 109, 119 (2d Cir. 2004) (citing *Tolbert v. Queens Coll.*, 242 F.3d 58, 70 (2d Cir. 2001)); *see Pike Co. v. Universal Concrete Prods., Inc.*, 665 F. Supp. 3d 365, 373 (W.D.N.Y. 2023). The standard for granting such motions is high. *See Lavin-McEleney v. Marist Coll.*, 239 F.3d 476, 479 (2d Cir. 2001). "A court may set aside a jury's verdict 'only where there is

---

[7] The parties also presented evidence on Smarter Alloys' claim that Loma Linda and Viecilli had breached the consulting agreement by withdrawing permission for a certain paper to publish in the *American Journal of Orthodontics and Dentofacial Orthopedics*. *See* Docket Item 287 at 4 (verdict sheet). But the jury found that Smarter Alloys had breached the contract, rather than either Loma Linda or Viecilli. *See id.* at 1, 4. And Smarter Alloys does not challenge the jury's ruling on its counterclaim and third-party claim here. *See* Docket Item 326. This Court therefore discusses only Loma Linda's breach of contract claim throughout this decision.

such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded [persons] could not arrive at a verdict against [that party]." *Stampf v. Long Island R.R. Co.*, 761 F.3d 192, 197 (2d Cir. 2014) (quoting *Bucalo v. Shelter Island Union Free Sch. Dist.*, 691 F.3d 119, 127-28 (2d Cir. 2012)).  In ruling on such motions, courts "cannot set aside the jury's credibility findings and cannot find for the movant based on evidence the jury was entitled to discredit." *Fabri*, 387 F.3d at 119 (citing *Tolbert*, 242 F.3d at 70).

In addition to moving for judgment as a matter of law, a defendant who loses at trial also may seek remittitur of the jury's monetary award.  "Remittitur is the process by which a court compels a plaintiff to choose between reduction of an excessive verdict and a new trial." *Stampf*, 761 F.3d at 204 (quoting *Shu-Tao Lin v. McDonnell Douglas Corp.*, 742 F.2d 45, 49 (2d Cir. 1984)).  "The [c]ourt's ability to enter a conditional order of remittitur derives from its discretion to order a new trial" under Federal Rule of Civil Procedure 59.  *See Pike Co.*, 665 F. Supp. 3d at 374 (citing *Lore v. City of Syracuse*, 670 F.3d 127, 176-77 (2d Cir. 2012)).  Rule 59 is somewhat "less stringent . . . than Rule 50," calling "for deference to jury determinations while affording discretion to the trial judge to order a new trial in the event of manifest injustice."[8] *Id.* (first quoting

---

[8] As one district court has recently noted, the Second Circuit has not been entirely clear on whether this less strict standard of review on Rule 59 motions for a new trial "applies to Rule 59 remittitur motions in particular"; indeed, the court has "stat[ed] in dicta that 'on a motion to set aside or reduce a jury verdict for excessiveness, trial courts . . . are required to view all evidence in the light most favorable to sustaining the jury's verdict.'"  *See Martinez v. City of New York*, 2023 WL 4627739, at *15 (E.D.N.Y. July 19, 2023) (quoting *Payne v. Jones*, 711 F.3d 85, 98 n.10 (2d Cir. 2013)), *appeal*

*Manley v. AmBase Corp.*, 337 F.3d 237, 244 (2d Cir. 2003); then quoting *Top Ridge*

*Invs., LLC v. Anichini, Inc.*, 2018 WL 11419657, at *1 (D. Vt. May 7, 2018)).

## DISCUSSION

## I.    MOTION FOR JUDGMENT AS A MATTER OF LAW

Smarter Alloys first moves "to correct jury errors regarding contract

interpretation." Docket Item 326 at 15. It argues that "[t]he jury's finding of liability for

royalties should be reversed because no reasonable jury could have found [that] the

SmartArch Universal was a Product under the [c]onsulting [a]greement." *Id.* "The only

reasonable interpretation," it says, "is that the SmartArch Universal is not a 'Product'"

because:

> (1) it does not fall within the plain meaning of "Product"; (2) it does not
> address the [c]onsulting [a]greement's primary purpose or "Clinical
> Problem["];] and (3) instead of resting on a "Potential Solution" to that
> ["]Clinical Problem["], it uses research [that] Smarter Alloys, Ormco, Dr.
> [Charles] Burstone[,] and Dr. Viec[i]lli developed before Dr. Viec[i]lli worked
> at Loma Linda.

*Id.* at 16 (emphasis omitted).

Loma Linda counters that none of Smarter Alloys' arguments justify disturbing

the jury verdict. *See* Docket Item 311 at 10-20. As an initial matter, it says that Smarter

Alloys' arguments are barred by its failure to raise them at an earlier stage of the case

and by this Court's decision on Smarter Alloys' summary judgment motion. *Id.* at 10-12.

And it says that even if Smarter Alloys' arguments were not barred, Loma Linda "clearly

---

*withdrawn*, 2023 WL 9660120 (2d Cir. Nov. 30, 2023). Regardless, "the Second Circuit
has made clear that a jury's verdict should 'rarely be disturbed,' and a Rule 59 remittitur
motion, as is true on any motion for a new trial, should therefore only be granted if the
verdict was 'seriously erroneous or a miscarriage of justice.'" *Id.* (quoting *Farrior v.
Waterford Bd. of Educ.*, 277 F.3d 633, 635 (2d Cir. 2002)).

presented sufficient evidence at trial for the jury to find that the SmartArch Universal is a 'Product' and that [Smarter Alloys] breached the [c]onsulting [a]greement." *Id.* at 13. This Court considers each argument in turn.

### A.    Whether Smarter Alloys Properly Preserved Its Rule 50(b) Arguments

Loma Linda first argues that because Smarter Alloys "failed to raise any of th[e] . . . issues [asserted here] in its Rule 50(a) motion," it "cannot challenge the [verdict's] sufficiency . . . under Rule 50(b)." *Id.* at 11.

Under Federal Rule of Civil Procedure 50(a), a party may move for judgment as a matter of law "at any time before the case is submitted to the jury" as long as the non-moving party "has been fully heard on an issue . . . and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." *See* Fed. R. Civ. P. 50(a)(1); *see also Holmes v. United States*, 85 F.3d 956, 961-62 (2d Cir. 1996). Rule 50 "requires the [moving] party . . . to 'specify the judgment sought and the law and the facts on which the moving party is entitled to the judgment.'" *Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 286 (2d Cir. 1998) (quoting Fed. R. Civ. P. 50(a)(2)).

"If the court does not grant a motion for judgment as a matter of law made under Rule 50(a)" and the jury renders a verdict in the opponent's favor, a party may renew its motion under Rule 50(b). *See* Fed. R. Civ. P. 50(b). But "because [a] Rule 50(b) motion is only a renewal of the pre[-]verdict motion, it can be granted only on grounds advanced in the pre[-]verdict motion." *Lore*, 670 F.3d at 153 (alteration and emphasis omitted) (quoting Fed .R. Civ. P. 50 Advisory Committee's Notes to 2006 Amendment); *see also Exxon Shipping Co. v. Baker*, 554 U.S. 471, 485 n.5 (2008) ("A motion under

Rule 50(b) is not allowed unless the movant sought relief on similar grounds under Rule 50(a) before the case was submitted to the jury.").  Therefore, if a party does not assert an issue in its Rule 50(a) motion, the court may not grant a Rule 50(b) motion raising that issue "unless that action is required in order to prevent manifest injustice."  *See Lore*, 670 F.3d at 153.

"Rule 50(a) 'does not define how specific' the motion must be."  *Galdieri-Ambrosini*, 136 F.3d at 286 (quoting *Anderson v. United Tel. Co.*, 933 F.2d 1500, 1504 (10th Cir. 1991)).  But the purpose of the specificity requirement is "to give the other party an opportunity to cure the defects in proof that might otherwise preclude [it] from taking the case to the jury."  *Id.* (quoting *Baskin v. Hawley*, 807 F.2d 1120, 1134 (2d Cir. 1986)); *see also Lore*, 670 F.3d at 153 (similar).  And so the Second Circuit has held that at a minimum, a motion for judgment as a matter of law "must at least identify the specific element that the [moving party] contends is insufficiently supported."  *See Galdieri-Ambrosini*, 136 F.3d at 286.  In determining whether a Rule 50(a) motion is sufficiently specific, courts must look at both the motion as well as any "ensuing colloquy between counsel and the trial court," which may "flesh[] out the motion" and "provide the opposing party with the requisite notice."  *Id.* at 287.

After Loma Linda "close[d its] case in chief," Smarter Alloys moved for judgment as a matter of law under Rule 50(a).  *See* Docket Item 280 at 100-01.  More specifically, Smarter Alloys argued that Loma Linda "ha[d] failed to go ahead and prove [the] essential elements of its case with respect to whether [the] SmartArch Universal uses a force prescription that . . . specifically targets any of the malocclusions identified in paragraph 5A of the research plan as required by the contract."  *Id.* at 101.  "[T]he only

11

potential[ly relevant] testimony" that Loma Linda offered, Smarter Alloys said, was from Loma Linda's expert witness, Dr. Ruedger Rubbert, but "[a]ll he did was testify about his analysis of marketing records and other documents . . . generated years after the contract had been written." *Id.* And this, Smarter Alloys asserted, was insufficient because "the key touchstone to contract[ual] interpretation is the intention of the parties, not what somebody else after the fact relying on other records interprets the words of the contract to mean." *Id.*

Loma Linda opposed this motion, stating that Rubbert's testimony was "relevant" to determining the meaning of "Product" and adding that Viecilli also had testified about "the intention of the parties . . . based on conversations he had with" Smarter Alloys' President and Chief Executive Officer, Dr. Ibraheem Khan.[9] *Id.* at 101-02. This Court denied the motion. *See id.* at 102.

Later, after both parties rested their cases, Smarter Alloys renewed its motion for judgment as a matter of law under Rule 50(a) "with respect to the interpretation of the contract." *See* Docket Item 281 at 233. As before, Smarter Alloys stressed that the intent of the parties is paramount to contractual interpretation, referring to the jury instruction it had submitted on that issue. *See id.*; *see also* Docket Item 259 at 2 (Smarter Alloys' proposed jury instruction). It then reiterated its argument that Rubbert's testimony on "whether [the] SmartArch Universal is a Product relied solely on documents and technical publications from one to four years after the contract had been

---

[9] As he noted in a declaration filed with the Court, Dr. Khan's full name is Dr. Mohammad Ibraheem Khan. *See* Docket Item 59-1. But he is "commonly known and referred to as Dr. Ibraheem Khan," *see id.* at ¶ 1, and that is how the parties referred to him throughout these proceedings.

signed." Docket 281 at 234. And so, it contended, Rubbert's testimony did not provide "appropriate . . . evidence of what the parties' intent was during the contract negotiations." *Id.* "[I]n contrast," Smarter Alloys said, testimony "from . . . Dr. Viecilli and [Smarter Alloys' Vice President of Operations Dr. Michael Kuntz]" about "contemporaneous documents" showed that the parties intended the term "Product" to refer only to "standard malocclusion" wires, not to "universal . . . wire[s]" that "everybody agreed w[ere] a different product." *See id.* at 234-35. After Loma Linda summarily noted its opposition to the renewed motion, this Court again denied it. *See id.* at 235.

Loma Linda argues that Smarter Alloys' Rule 50(a) motion "only properly preserved the issue of whether [Rubbert's testimony] was sufficient to establish that the SmartArch Universal" fit the consulting agreement's definition of "Product"—an issue, it says, Smarter Alloys does not raise again here. *See* Docket Item 311 at 11 & n.1. This Court is not so sure. It certainly is true that Smarter Alloys' Rule 50(a) arguments looked at the issue from an angle different than that in its Rule 50(b) arguments. But in both instances, Smarter Alloys contended that Loma Linda had failed to offer evidence sufficient to show that the SmartArch Universal was a Product under the consulting agreement. In other words, as Smarter Alloys argues, its Rule 50(a) motion "identified the specific element [it] contended was insufficiently supported." *See* Docket Item 314 at 9 (alterations omitted) (quoting *Galdieri-Ambrosini*, 136 F.3d at 286).

But all that is of no moment because regardless of whether or not Smarter Alloys properly preserved its Rule 50(b) arguments, the Court would deny them for the reasons stated below. It therefore assumes without deciding that Smarter Alloys preserved the issues it raises now and proceeds to consider the motion. *See Martinez*

*v. City of New York*, 2023 WL 4627739, at *7 n.7 (E.D.N.Y. July 19, 2023) (assuming without deciding that Rule 50(b) argument was properly before it), *appeal withdrawn*, 2023 WL 9660120 (2d Cir. Nov. 30, 2023).

### B.    Whether the Contract's Ambiguity Can Be Raised at this Stage

Loma Linda argues that even if Smarter Alloys had properly preserved its argument, it "cannot address the alleged ambiguity of the [c]onsulting [a]greement [in] a Rule 50 motion because it is not a jury issue"; indeed, Loma Linda notes, this Court already determined that the consulting agreement was ambiguous when deciding Smarter Alloys' summary judgment motion.  *See* Docket Item 311 at 12.  This Court agrees.

"Where contract language is ambiguous, the differing interpretations of the contract present a triable issue of fact.*"  Golden Pac. Bancorp v. FDIC*, 273 F.3d 509, 514-15 (2d Cir. 2001) (quoting *Bank of Am. Nat'l Trust and Sav. Ass'n v. Gillaizeau*, 766 F.2d 709, 715 (2d Cir.1985)).  But under New York law, "[w]hether a contract is ambiguous is a question for the court"—a question of law beyond the province of the jury.  *See id.* (quoting *Gillaizeau*, 766 F.2d at 715).

Consistent with those principles, this Court determined at the summary judgment stage that the consulting agreement was ambiguous.  *See* Docket Item 193 at 11-17.  In doing so, it rejected the core of the argument that Smarter Alloys attempts to raise now.  Smarter Alloys' motion for judgment as a matter of law contends that the contract's "plain" language is irreconcilable with the jury's verdict.  *See* Docket Item 326 at 15-22.  Noting that interpretations that render contractual verbiage "superfluous" are "disfavor[ed]," *see id.* at 16 (quoting *Int'l Multifoods Corp. v. Commercial Union Ins. Co.*,

14

309 F.3d 76, 86 (2d Cir. 2002)), Smarter Alloys repeatedly emphasizes that it would be illogical to understand the SmartArch Universal as a "Product," *see id.* at 17, 20. "Had the parties intended to provide royalties for *any* archwire treating *any* malocclusion," Smarter Alloys says, "there would be no need to identify the three malocclusions"; "[i]nstead, they could have defined a 'Product' as one that uses 'force prescriptions targeting malocclusions' generally." *See id.* at 17. Thus, it says, "[r]eading the definition of 'Product' to include an archwire that targets 'any' malocclusion would . . . read them out of the Agreement entirely." *Id.*

This Court already rejected that very argument. *See* Docket Item 193 at 12-13. As it explained in its summary judgment decision:

> The consulting agreement says that Smarter Alloys owes royalties on the sales of an "archwire that uses the force prescriptions targeting the three malocclusions set out in Section 5 of Exhibit A, Research Plan." [But i]t does not say that the archwire must use force prescriptions that target *only* those three malocclusions. So "Product" might be limited to an archwire using force prescriptions that target one or more of the three malocclusions *and only those three malocclusions*; or "Product" might include an archwire using force prescriptions that target one or more of them, as well as others, simultaneously. Stated differently, the consulting agreement requires that a "Product" use "the force prescriptions targeting" the three listed malocclusions; it does not require that a "Product" use those force prescriptions to the exclusion of using force prescriptions targeting any other part of the dental arch. And that is an ambiguity.[10]

*Id.* (internal citations and some italics omitted).

---

[10] The Court further stated: "Had the parties wanted to specify the definition that Smarter Alloys urges and that Judge Roemer accepted, they could easily have done so by inserting the word 'only'—i.e., by defining 'Product' as 'an archwire that uses the force prescriptions targeting only the three malocclusions set out in Section 5 of Exhibit A, Research Plan.' They did not. And the absence of that word, or some similar limiting phrasing, creates the ambiguity highlighted by this Court." Docket Item 193 at 13 n.8 (internal citation and italics omitted).

Smarter Alloys says that it would make no sense for the parties to refer to the

three malocclusions specifically unless they intended to refer to a product that targeted

those malocclusions and only those malocclusions.  *See* Docket Item 326 at 17.  But

that is not logically sound:  The parties very well could have contemplated royalties for a

product that targets certain teeth alignments as well as others.  In that case, royalties

would be owed for devices targeting only the three malocclusions and for devices

targeting the three malocclusions and other malocclusions.  In fact, because under the

agreement, Viecilli was providing the technical force prescriptions for the three

malocclusions, *see* Docket Item 323-6 at 7, it seems reasonable that he should get

something when those force prescriptions are used, regardless of whether they are

used alone or with others.  And that is exactly what the jury found here.

Smarter Alloys disputes that its motion for judgment as a matter of law

"challenge[s] the Court's ruling that the term Product is ambiguous."  Docket Item 314 at

6.  Rather, it says, it is simply arguing "that 'even taking [Loma Linda's] extrinsic

evidence into account,' a reasonable jury could only conclude it 'does not support [Loma

Linda's] reading' of the contract" because it is simply not reasonable to understand

"Product" as including the SmartArch Universal.  *See id.* (quoting *E. Cont'l Mining &

Dev. Ltd. v. Signet Grp. LLC*, 2015 WL 5707145, at *13 n.20 (S.D.N.Y. Sept. 29,

2015)).[11]  Indeed, it says, the "Clinical Problem" and "Potential Solution" sections of the

---

[11] Smarter Alloys' citation of *Eastern Continental Mining & Development, Ltd.*, is
unavailing.  *See* Docket Item 314 at 6.  That case involved a "summary bench trial on
the papers pursuant to the parties' consent," and the court concluded that the
contractual provisions at issue "appear[ed] to be sufficiently clear such that the [c]ourt
could rule in [the defendant's] favor as a matter of law without having to consider the
extrinsic evidence."  *Signet Grp.*, 2015 WL 5707145, at *1, *11.  The court further stated
that the plaintiff's arguments based on "extrinsic evidence" could not "alter the

consulting agreement make it clear that "Product" means a device that "address[es] 'specific classes' of 'severe' malocclusions," rather than something that "globally target[s] more mild malocclusions." *See* Docket Item 326 at 19. And it contends that the evidence at trial clearly showed that the SmartArch Universal fell into the latter category.[12] *See id.* at 20.

In other words, Smarter Alloys attempts to cast this argument as one about the trial record. But in truth, it is an argument about the ambiguity of the contract, an issue on which this Court already has ruled. The Court explicitly held that the language of the consulting agreement—standing on its own—does not resolve the question of whether Smarter Alloys owed Loma Linda royalties for the SmartArch Universal. *See* Docket Item 193 at 14. And that was the very question that this Court sent to the jury.[13]

In sum, this Court already has ruled on the argument that Smarter Alloys presses now. And to the extent that Smarter Alloys moves for reconsideration of that decision—

---

[contract's] plain meaning." *See id.* at *13 n.20. Nothing in that decision suggests that it is the jury's job to consider whether the extrinsic evidence alters a court's prior conclusion that a contract is ambiguous.

[12] Loma Linda disputes that the record showed anything of the sort. *See* Docket Item 311 at 18.

[13] Smarter Alloys says that this Court's instructions to the jury show that Smarter Alloys is not attempting to relitigate an already decided issue but rather seeking to correct juror error. Specifically, it cites this Court's direction to the jurors that they should "first consider the intent of the parties as revealed by the language that they used in the contract" and should consider both "the term's plain meaning, as well as how the terms fit into the contract as a whole." Docket Item 314 at 6 (emphases omitted) (quoting Docket Item 288 at 149-50). But those instructions on how to go about interpreting the words of a contract did not ask the jury to determine whether the definition of "Product" was ambiguous as a matter of law.

17

something that it appears to disclaim, *see* Docket Item 314 at 6—the Court declines to do so.[14]

### C.    Sufficiency of the Evidence

For the reasons just explained, it is not entirely clear that Smarter Alloys preserved its argument that the plain language of the consulting agreement (including the description of the "Clinical Problem" and "Potential Solution") required a jury verdict in its favor. *See supra* Section I.A.  But even if it did, the Court already rejected that argument at the summary judgment stage when it determined that the consulting agreement is ambiguous.  *See supra* Section I.B.  Moreover, while Smarter Alloys argues that the evidence introduced at trial was insufficient to show that the SmartArch Universal was a Product, it essentially contends that evidence was not enough to "overcome [the consulting agreement's] plain meaning or [its] stated purposes."  *See* Docket Item 314 at 8-9.  It does not argue that the evidence was insufficient if one accepts—as this Court has ruled—that the "plain meaning" of the consulting agreement is not so "plain" and is, in fact, ambiguous.

If Smarter Alloys is challenging whether the evidence was sufficient to support Loma Linda's interpretation of the ambiguous text, this Court rejects that argument.  As

---

[14] The Second Circuit has held that "[t]he standard for granting such a motion is strict, and reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked—matters, in other words, that might reasonably be expected to alter the conclusion reached by the court."  *Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995).  "The major grounds justifying reconsideration are an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice."  *Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir. 1992) (citation and internal quotation marks omitted).  Smarter Alloys does not argue that any of those circumstances are present here, and this Court cannot find any.

explained above, a court may grant a Rule 50(b) motion "only if after viewing the evidence in the light most favorable to the non-moving party and drawing all reasonable inferences in favor of the non-moving party, it finds that there is insufficient evidence to support the verdict." *Fabri*, 387 F.3d at 119.  That standard—as Smarter Alloys itself acknowledges, Docket Item 314 at 9—is a high one, and Smarter Alloys cannot clear it here.  Loma Linda presented considerable evidence—including Rubbert's and Viecilli's testimony, as well as communications between Viecilli and Khan—that the SmartArch Universal was a "Product" within the meaning of the consulting agreement and that the parties intended it to be so.  *See* Docket Item 311 at 14-17.  The jury chose to credit that evidence, and this Court will not—indeed, cannot—second guess their determination.  *See Fabri*, 387 F.3d at 119.

Smarter Alloys' motion for judgment as a matter of law therefore is denied.

## II.    MOTION FOR REMITTITUR

In the alternative, Smarter Alloys seeks remittitur, arguing that "the jury's award . . . of $1.5 million in royalties" is clearly "[e]xcessive" and the result of an "easily identifiable jury error."  Docket Item 326 at 22-23 (bold omitted).  In light of that mistake, it says, the Court should remit the jury's award to $42,857.  *Id.* at 25, 28.  Loma Linda vociferously objects to such "a massive 97% [reduction to] the jury's damage award."  Docket Item 311 at 20.  In its view, this Court should not disturb the jury's award and—should it come to the opposite conclusion—it certainly should not subtract that much.  *See id.* at 28 n.8.

A.    **Standard of Review**

In diversity cases like this one,[15] courts apply the law of the forum state to

determine whether an award of damages is so high as to warrant remittitur.  *See*

*Imbrogno v. Chamberlin*, 89 F.3d 87, 90 (2d Cir. 1996) (stating that "in deciding

remittitur motions in diversity cases, federal courts apply federal procedural standards

and state substantive law" and holding that "the trial court should have . . . looked to

---

[15] Loma Linda's complaint invoked this Court's diversity jurisdiction, asserting
that the parties were from different states (more specifically, a state and a foreign state)
and that the amount in controversy exceeded $75,000.  Docket Item 1 at ¶¶ 2-4; Docket
Item 113 at ¶¶ 2-4; *see also* 28 U.S.C. § 1332.  While the "party invoking the jurisdiction
of the federal court has the burden of proving that it appears to a reasonable probability
that the claim is in excess of the statutory jurisdictional amount[,] . . . [that] burden is
hardly onerous[ because federal courts] recognize a rebuttable presumption that the
face of the complaint is a good faith representation of the actual amount in controversy."
*Scherer v. Equitable Life Assurance Soc'y of U.S.*, 347 F.3d 394, 397 (2d Cir. 2003)
(citations and internal quotation marks omitted).  Indeed, "[t]o overcome the face-of-
complaint presumption, the party opposing jurisdiction must show to a legal certainty
that the amount recoverable does not meet the jurisdictional threshold."  *Id.* (citation and
internal quotation marks omitted).

At trial, in response to questioning from this Court after testimony on damages,
*see* Docket Item 279 at 189-91, both parties filed trial briefs on whether this Court had
subject matter jurisdiction and, more specifically, whether the amount in controversy
requirement was met, *see* Docket Items 265 and 267.  Smarter Alloys argued that this
Court lacked jurisdiction because Loma Linda had not established to a legal certainty
that damages at the time of filing were greater than $75,000, Docket Item 265 at 2-3;
Loma Linda disagreed, Docket Item 267 at 2-7.  The Court heard oral argument on the
issue before finding that it had jurisdiction but stating that if Smarter Alloys wished to file
another motion with additional caselaw showing the opposite, the Court would "rethink"
its position.  *See* Docket Item 281 at 3-10.  Smarter Alloys did not raise the issue again,
and it does not challenge this Court's jurisdiction in its post-trial briefing.  *See* Docket
Items 314 and 326.  And indeed, there is no evidence that—at the time the complaint
was filed—potential damages, as a matter of legal certainty, were less than $75,000.
*See Scherer*, 347 F.3d at 397-99 (explaining that courts "measure the amount in
controversy as of the date of the complaint" and holding that district court improperly
dismissed for lack of subject matter jurisdiction a complaint that asserted damages in
excess of $75,000, even when subsequent state proceedings had determined the
defendant's liability to be much less than $75,000).

Connecticut substantive law to determine whether the jury award was excessive");

*Cantu v. Flanigan*, 705 F. Supp. 2d 220, 225 (E.D.N.Y. 2010) ("When assessing the

excessiveness of damages in a diversity suit, a federal district court must apply the law

of the forum state.").

Federal courts—at least when not sitting in diversity jurisdiction—will not remit a

jury award unless the "award shocks the conscience."  *See Dancy v. McGinley*, 843

F.3d 93, 113 (2d Cir. 2016); *Patterson v. Balsamico*, 440 F.3d 104, 119 (2d Cir. 2006).

"Prior to 1986, New York law employed the same standard as the federal courts" to

determine whether a jury award was excessive.  *See Gasperini v. Ctr. for Humans.,*

*Inc.*, 518 U.S. 415, 422 (1996) (citation omitted), *as amended* (Dec. 22, 1995).  But in

that year, New York passed "a series of tort reform measures," including N.Y. C.P.L.R.

§ 5501(c), which set a new, easier-to-meet standard for reviewing certain jury awards.

*See Liberty Media Corp. v. Vivendi Universal, S.A.*, 923 F. Supp. 2d 511, 532 (S.D.N.Y.

2013) (quoting *Gasperini*, 518 U.S. at 423); *see also Vioni v. Providence Inv. Mgmt.,*

*LLC*, 2017 WL 3283860, at *9 (S.D.N.Y. Aug. 2, 2017), *aff'd*, 750 F. App'x 29 (2d Cir.

2018) (summary order).  The parties disagree about whether that section applies here.

*Compare* Docket Item 326 at 23-24 (Smarter Alloys' arguing that it applies), *with* Docket

Item 311 at 21-24 (Loma Linda's arguing that it does not).

Section 5501(c) provides that

[i]n reviewing a money judgment in an action in which an itemized verdict is
required by [Rule 4111 of the C.P.L.R.] in which it is contended that the
award is excessive or inadequate and that a new trial should have been
granted unless a stipulation is entered to a different award, the [court[16]] shall

---

[16] The statute specifically tasks the state's appellate division with carrying out this
review, *see* N.Y. C.P.L.R. § 5501(c), but trial courts may apply it as well when deciding
post-trial motions, *see Mejia v. Japan Soc'y, Inc.*, 85 Misc. 3d 1208(A), 226 N.Y.S.3d

determine that an award is excessive or inadequate if it deviates materially from what would be reasonable compensation.

N.Y. C.P.L.R. § 5501(c).  Rule 4111, in turn, requires itemized verdicts in two overlapping categories of lawsuits: actions for "medical, dental, or podiatric malpractice" and "action[s] brought to recover damages for personal injury, injury to property[,] or wrongful death."  N.Y. C.P.L.R. 4111(d)-(e); *see also Liberty Media*, 923 F. Supp. 2d at 532 (noting limited categories of cases to which Rule 4111 applies).

Courts have reached different conclusions about whether section 5501(c)'s "deviates materially" standard applies "outside . . . the tort context" to breach of contract cases like this one.  *See Liberty Media*, 923 F. Supp. 2d at 532.  At least two judges in the Southern District of New York have noted that the statute may not reach so far, *see Vioni*, 2017 WL 3283860, at *9; *Liberty Media*, 923 F. Supp. 2d  at 532 & n.150, and at least one commentary has suggested something similar, *see* Richard C. Reilly, Practice Commentaries, McKinney's Cons. Laws of N.Y., Book 7B, C5501:10 (2014) ("[P]ractitioners should note that the reference to cases in which an itemized verdict is required by C.P.L.R. 4111 appears to restrict the operation of the 1986 amendment to [section] 5501(c) to the tort case.  The tort case, however, is the traditional context of the excess verdict problem").

On the other hand, as Smarter Alloys argues, *see* Docket Item 314 at 11 & n.3, several federal courts have applied or at least referenced the "deviates materially" standard in assessing damages in non-tort cases.  *See, e.g.*, *Alessi Equip., Inc. v. Am.*

541, 2025 WL 396779, at *14-15 (Sup. Ct. Bronx Cnty. Feb. 4, 2025) (collecting cases); *see also Gasperini*, 518 U.S. at 425 ("Although phrased as a direction to New York's intermediate appellate courts, [section] 5501(c)'s 'deviates materially' standard, as construed by New York's courts, instructs state trial judges as well.").

*Piledriving Equip., Inc.*, 2022 WL 4080663, at *15 (S.D.N.Y. Sept. 2, 2022); *Qiyuan Shi v. Gyamera*, 401 F. Supp. 3d 452, 464-65 (S.D.N.Y. 2018); *Learning Annex Holdings, LLC v. Rich Glob., LLC*, 2012 WL 2878124, at *6 (S.D.N.Y. July 13, 2012); *Health All. Network, Inc. v. Cont'l Cas. Co.*, 245 F.R.D. 121, 131 (S.D.N.Y. 2007), *aff'd*, 294 F. App'x 680 (2d Cir. 2008); *Uni-Rty Corp. v. Guangdong Bldg., Inc.*, 2012 WL 1901200, at *6 (S.D.N.Y. May 25, 2012), *aff'd.* 571 F. App'x 62 (2d Cir. 2014).  None of the decisions that Smarter Alloys cites, however, provide any analysis as to why, despite its language suggesting the contrary, section 5501(c) applies to breach of contract or other non-tort cases.

Based on the plain language of the statute, and for the reasons stated in *Liberty Media* and *Vioni*, this Court is inclined to find that section 5501(c) does not apply in breach of contract cases like this one.  Ultimately, however, it need not resolve the issue because the award here deviates materially and shocks the Court's conscience— that is, under both of the two possible standards, remittitur is warranted.

## B.    Whether Jury Award Is Excessive

As the Second Circuit has explained, "[a] district court has authority to enter a conditional order of remittitur, compelling a plaintiff to choose between reduction of an excessive verdict and a new trial[,] 'in at least two distinct kinds of cases.'"  *Kirsch v. Fleet St., Ltd.*, 148 F.3d 149, 165 (2d Cir. 1998) (quoting *Trademark Research Corp. v. Maxwell Online, Inc.*, 995 F.2d 326, 337 (2d Cir. 1993)).  More specifically, remittitur is warranted:

> (1) where the court can identify an error that caused the jury to include in the verdict a quantifiable amount that should be stricken, and (2) more generally, where the award is intrinsically excessive in the sense of being

greater than the amount a reasonable jury could have awarded, although the surplus cannot be ascribed to a particular, quantifiable error.

*Id.* at 165 (alteration and some internal quotation marks omitted) (quoting *Trademark Research*, 995 F.2d at 337); *see also Scott v. Rosenthal*, 53 F. App'x 137, 142 (2d Cir. 2002) (summary order) (applying this standard to motion for remittitur on damages awarded for quasi-contract claim under New York law).  "Where there is no particular discernable error, . . . a jury's damage award may not be set aside as excessive unless 'the award is so high as to shock the judicial conscience and constitute a denial of justice.'"  *Kirsch,* 148 F.3d at 165 (quoting *O'Neill v. Krzeminski*, 839 F.2d 9, 13 (2d Cir. 1988)).

"It is well settled that calculation of damages is the province of the jury," *Ismail v. Cohen*, 899 F.2d 183, 186 (2d Cir. 1990), and a court cannot decide a motion for remittitur based on "whether the amount is higher than [what the judge] personally would have awarded," *Genovese v. County of Suffolk*, 128 F. Supp. 3d 661, 675 (E.D.N.Y. 2015).  Moreover, under New York law, "[d]amages for breach of contract should put the plaintiff in the same economic position [it] would have occupied had the breaching party performed the contract."  *Uni-Rty. Corp.*, 2012 WL 1901200, at *5 (quoting *Boyce v. Soundview Tech. Grp., Inc.*, 464 F.3d 376, 384-85 (2d Cir. 2006)). Those damages "can include [the amount of] lost profits, even if the breach occurred before any profits were realized."  *See W. Geophysical Co. of Am. v. Bolt Assocs., Inc.*, 584 F.2d 1164, 1172 (2d Cir. 1978).

Smarter Alloys argues that the jury award of $1.5 million must be reduced—under *any* standard for review—because it is unsupported by any evidence and, indeed, entirely speculative.  *See* Docket Item 314 at 10-14.  Loma Linda disagrees, stating that

24

"the jury is presumed to have properly awarded damages" and that "sufficient evidence exists to demonstrate that the jury's verdict does not shock the conscience." Docket Item 311 at 25-26. This Court agrees with Smarter Alloys.

At trial, Loma Linda's expert witness on damages, Joanne Johnson, testified that Loma Linda was owed "royalties ranging between $24,442 and $60,732" for sales of the SmartArch Universal from 2016 through February 2024. *See* Docket Item 279 at 125. Johnson arrived at those figures by reviewing "the legal filings in this case"; "the consulting agreement"; "deposition testimony"; "interrogatory responses"; "profit information [from] Smarter Alloys," "internal company emails" and "presentations"; and Johnson's own "market background research." *See id.* at 126. She then determined the amount of royalties owed by multiplying Smarter Alloys' total sales revenue for the SmartArch Universal ($1,681,238) by the gross profit margin (which Johnson calculated to be 36.3%, 85.9%, or 90.3% based on three different internal documents from Smarter Alloys) and then by the 4% royalty percentage provided for in the consulting agreement. *Id.* at 132-47, 151. Based on that analysis, she determined that the lowest amount of royalties was $24,442 (based on the 36.3% gross profit margin), while the highest was $60,732 (based on the 90.3% gross profit margin). *Id.* at 151-52.

In contrast, there was no evidence offered at trial that might support a damage award of $1.5 million. The jury appears to have taken this number from the consulting agreement, which provides that Smarter Alloys "at its option, may elect at any time to terminate any future royalty payments with a one-time royalty buyout of $1,500,000 . . . less any royalties already paid" under the agreement. *See* Docket Item 323-6 at 9. Indeed, during Loma Linda's closing argument, its counsel stated:

> The one thing Smarter Alloys has proven is that they cannot be trusted. My
> ask is that you take this into consideration when determining the amount of
> damage[s] to award Loma Linda. The evidence shows that the consulting
> agreement specifically capped royalties at $1.5 million based on the buyout
> provision. We believe that you can award Loma Linda up to this royalty cap
> in damages, but certainly not more than [$]1.5 million to avoid the risk of
> Loma Linda not being made whole by Smarter Alloys' unscrupulous
> business practices.[17]

Docket Item 288 at 61-62. And Loma Linda now argues that the jury reasonably could

have concluded that Smarter Alloys had "implicitly elected the buyout." Docket Item 311

at 26 (emphasis omitted). More specifically, it says, "[t]he evidence at trial clearly

demonstrated that [Smarter Alloys] did not 'choose' to pay the 4% royalty, given that

[Smarter Alloys] did not even inform Loma Linda that it had begun to sell the SmartArch

Universal and did not provide any sales information for Loma Linda to calculate

royalties." *Id.*

Loma Linda provides no support for its assertion that the evidence offered at trial

might sustain an award of $1.5 million. As Smarter Alloys points out, its failure to pay

royalties has a simple explanation—its stated position, truly held or not, that it did not

owe royalties on the SmartArch Universal. *See* Docket Item 314 at 13. Nothing in the

record even hints that Smarter Alloys chose the buyout option. And Loma Linda does

not cite any cases in which courts have held that a litigant implicitly chose a buyout

option under circumstances like these; in fact, it cites no cases where a court found that

a buyout option had been implicitly accepted. *See generally* Docket Item 311.

---

[17] Smarter Alloys did not object to Loma Linda's closing argument regarding the
$1.5 million buyout. *See* Docket Item 288 at 61-62. Nonetheless, that does not
preclude it from challenging the damages award of $1.5 million as unsupported by the
evidence and shocking to the conscience.

Instead, the jury's award of $1.5 million to Loma Linda is pure speculation based on the premise that Smarter Alloys *might have* chosen to opt for the buyout *if* it had not breached the consulting agreement.  And that cannot be the basis for a damage award. *See Vioni*, 2017 WL 3283860, at *9 (granting motion for remitter where evidence only supported award based on base salary of one recruited employee, not based on that employee's bonus or the recruiting of eight other employees); *Exodus Partners, LLC v. Cooke*, 2007 WL 120053, at *16-17 (W.D.N.Y. Jan. 17, 2007) (overturning "jury's $330,000 contract damages award" because there was "no evidence to justify an award of damages for the failed . . . transaction [at issue in the case] that was more than zero dollars but less than $500,000").

### C.    What Damages Should Be Reduced To

That leaves the question of what damages should be awarded instead.  When a court "finds that remittitur is warranted, it 'should reduce the verdict only to the maximum that would be upheld by the trial court as not excessive.'"  *Webber v. Dash*, 607 F. Supp. 3d 407, 414 (S.D.N.Y. 2022) (quoting *Earl v. Bouchard Transp. Co.*, 917 F.2d 1320, 1328 (2d Cir. 1990)).  And "[i]t is well settled that where the existence of damages is certain, uncertainty as to their amount will not bar recovery, provided the claimant provides a 'stable foundation for a reasonable estimate.'"  *Exodus Partners*, 2007 WL 120053, at *7 (quoting *Boyce*, 464 F.3d at 392).

The parties offer different suggestions about what the reduced damages should be if the Court finds—as it has—that remittitur is appropriate.  Smarter Alloys says that the Court should remit the jury award to $42,857, the "midpoint of the [d]amages [r]ange" provided by Johnson.  *See* Docket Item 326 at 28.  But Smarter Alloys provides

no basis for reducing the amount to the midpoint of that range; indeed, such an argument appears to fly in the face of the rule that a court should "reduce the verdict . . . to the *maximum*" that could be "upheld . . . as not excessive." *See Webber*, 607 F. Supp. 2d at 414 (emphasis added). And Smarter Alloys conceded as much at oral argument. *See* Docket Item 325. So the Court rejects this proposal.

Loma Linda argues, in contrast, that if this Court reduces damages, it should reduce them to "either $183,633 (based on the anticipated sales in the [m]anufacturing [p]rocess [a]greement between [Smarter Alloys] and Ormco) or $60,732 (based on the sales numbers provided by [Smarter Alloys])." Docket Item 311 at 28. Its first suggestion is based on an agreement between Smarter Alloys and Ormco to sell SmartArch Universal archwires. *See id.* at 26; Docket Item 311-4 (copy of agreement); Docket Item 279 at 165, 167 (this Court's admitting that document into evidence). Under that agreement, which was signed in late 2018, Ormco agreed that it would pay between $3.20 and $3.70 dollars for each archwire for the first 42 months of the agreement's term, with the amount to increase if Ormco increased its list price after that time. *See* Docket Item 311-4 at 11. The agreement also set out the number of archwires to be sold under the agreement: 184,498 in the first 18 months; 239,847 in the next year; 359,770 in the year after that; and for each successive 12-month period "[5] percent more archwires than were purchased in the immediately preceding [12]-month period." *Id.* at 14.

In its closing argument, Loma Linda argued that the manufacturing process agreement provided a possibly more accurate assessment of Loma Linda's damages

than Johnson could, given that she had only Smarter Alloys' sales data.  As Loma Linda's counsel stated:

> [Smarter Alloys] refused to disclose purchase orders to substantiate their summary sales data, so we don't know whether Smarter Alloys had more sales than what they provided to us in this case.  If Ormco placed orders in accordance with [the manufacturing process agreement], Smarter Alloys' gross profits for sales during the period 2016 to 2024 would be $4.6 million if you apply . . . Johnson's profit margin of 90.3 percent.  So calculating 4 percent of these amounts reveals that Loma Linda's damages could be $183,633.

Docket Item 288 at 61.  There was some evidence in the record that sales were higher than what Smarter Alloys had indicated.  For instance, Johnson testified that her calculation of Smarter Alloys' revenue was taken from "Smarter Alloys' own summary of [its] sales."  Docket Item 279 at 135.  This, she suggested, was unusual:  "[T]ypically, [she has] other evidence [that can be] use[d] to corroborate this information and test it, but that kind of information was not provided by Smarter Alloys in this case[, s]o [she] had to use [Smarter Alloys'] summary-level data."[18]  *Id.*

Further, another of Loma Linda's witnesses, Vice President for Research Affairs at Loma Linda Health, Dr, Michael Samardzija, testified that Smarter Alloys was not "transparent [with] Loma Linda from day one."  *See* Docket Item 280 at 68-69.  And Michael Bain, Smarter Alloys' Chief Financial Officer, testified that the company has "no need [to track] cost of goods sold," so it does not do so.  *See id.* at 212-13.  He also said that his calculation of the cost of goods sold that he provided to Johnson was based on data from 2020, *see id.*, which Johnson testified "was not a good year for

---

[18] Johnson went on to say that she was "adopting [Smarter Alloys'] own revenue numbers," so that there was "no dispute between the parties that these are the revenues of the SmartArch Universal."  Docket Item 279 at 135.

dental services" because of the Covid-19 pandemic, *see* Docket Item 279 at 129 (noting that "people were not voluntarily going to sit in a dental chair" at that time).

Thus, there is evidence in the record suggesting that Smarter Alloys' gross revenues on sales of the SmartArch Universal, and therefore the royalties it owed Loma Linda, may be higher than Johnson estimated. But Loma Linda's estimate that those damages were $183,633 comes from its counsel's summation, Docket Item 288 at 61, not from the evidence. And Smarter Alloys argues that this figure is "speculative" and "unsupported" because it is based on "*anticipated* sales for six years after the [m]anufacturing [p]rocess [a]greement between [Smarter Alloys] and Ormco was executed," and there was no evidence offered at trial about "whether Ormco would have, or did, place orders under th[at a]greement." Docket Item 314 at 10 n.2 (some emphasis omittd). Elsewhere, it argues that "[u]nder the Ormco contract, [Smarter Alloys] anticipated selling no more than 1 million archwires between 2018 and 2025," which "would only yield $120,000 in royalties." *Id.* at 13 n.6.

The Court largely agrees with Smarter Alloys. Loma Linda did not offer any evidence that Ormco placed an order with Smarter Alloys in line with the agreement's projections. What is more, no witness testified that—assuming those numbers were correct—the resulting damages would be $183,633. As already noted, Loma Linda's own expert testified that damages were—at most—$60,732. The hypothesis that they might be three times as much was offered only by counsel. But arguments by counsel are not evidence.

In the absence of evidence, the Court cannot find that $183,633 is a "reasonable estimate" based on a "stable foundation." *See Exodus Partners*, 2007 WL 120053, at *7

(quoting *Boyce*, 464 F.3d at 392).  Instead, the maximum amount that may be upheld as "not excessive" is the maximum offered by Johnson, the plaintiff's damages expert: $60,732.  And that is the amount that damages should be remitted to here.

Smarter Alloys' motion for remittitur therefore is granted, and damages should be remitted to $60,732.

## III.    DETERMINATION OF PREVAILING PARTY

Finally, Smarter Alloys argues that if this Court grants its motion for judgment as a matter of law or for remittitur, "Smarter Alloys or no one should be determined the prevailing party."  Docket Item 326 at 28-29.  This Court agrees with Loma Linda, *see* Docket Item 311 at 28-29, that this issue would be most efficiently decided in the context of Loma Linda's motion for attorney's fees, which has been fully briefed by the parties and is currently pending before Judge Roemer, *see* Docket Items 301, 316, 319, and 321.  Indeed, deferring this question is particularly appropriate in light of the fact that this Court has denied Smarter Alloys' motion for judgment in its favor but granted Smarter Alloys' motion for remittitur.

## <u>CONCLUSION</u>

For the reasons explained above, Smarter Alloys' motion for judgment as a matter of law is DENIED, but its motion for remittitur is GRANTED.  More specifically, within **60 days of the date of this order**, Loma Linda may file an acceptance of the remittitur.[19]  If it does not, a new trial solely on the issue of damages will be scheduled

---

[19] Thousands of hours and millions of dollars have been spent litigating a matter worth—at most—about $60,000 in royalties.  This Court again urges the parties to stop

by the Court.  The Court DENIES without prejudice Smarter Alloys' motion to find that

Loma Linda is not the prevailing party in this action.

     SO ORDERED.

     Dated:  September 5, 2025
               Buffalo, New York

                                     */s/ Lawrence J. Vilardo*
                                     LAWRENCE J. VILARDO
                                     UNITED STATES DISTRICT JUDGE

---

fighting and negotiate a proportionate and reasonable resolution.  It is never too late to stop throwing good money after bad.